Susan WEIGERT, Plaintiff,

v.

GEORGETOWN UNIVERSITY,
Defendant.

No. CIV.A. 98–2955 RMU.

United States District Court,
District of Columbia.

Sept. 7, 2000.

**4**

Alan Banov, Alan Banov & Associates, Washington, DC, for Plaintiff.

William David Nussbaum, Jonathon T. Rees, Hogan & Hartson, L.L.P., Washington, DC, for Defendant.

## MEMORANDUM OPINION

### Granting the Defendant's Motion for Summary Judgment

URBINA, District Judge.

## I. INTRODUCTION

This matter comes before the court upon the defendant's motion for summary judgment. The plaintiff, Susan Weigert, alleges that the defendant, Georgetown University, violated the Americans with Disabilities Act of 1990 by discharging her from her position and retaliating against her for lodging complaints with the Affirmative Action Office.[1] After careful review of the parties' submissions, supporting evidence and deposition testimony, the court concludes that the defendant is entitled to summary judgment on the plaintiff's claims.

## II. BACKGROUND

In late 1990, Georgetown University hired Susan Weigert to work as a researcher in the Department of Psychiatry. See Compl. ¶ 11. Beginning in 1992, Ms. Weigert received both written and verbal warnings about her behavior and interactions with co-workers and supervisors, informing her that if she did not change her behavior, further disciplinary action would be taken. See Defendant's Motion for Summary Judgment ("Mot. for Summ. J.") at 7–8.

Meanwhile, within a few months after beginning her employment, Ms. Weigert informed her supervisor, Dr. Bonnie Green, that she had a disability caused by a neurological condition, and requested accommodations for her disability. See Mot. for Summ. J. at 4 n. 1. Although the parties agree that the defendant tried to accommodate those requests, Ms. Weigert states that the defendant's responses were not always adequate. See id. at 2–3; see also Plaintiff's Opposition to Defendant's Partial Motion to Dismiss, Or, in the Alternative, for Summary Judgment ("Opp'n") at 36. In November 1992, after complaining orally that the defendant's accommodations were inadequate, the plaintiff filed an internal complaint with the defendant's Office of Affirmative Action Programs ("AAO"), requesting that the AAO devise a plan to provide her with "suitable working conditions." Mot. for Summ. J. at 14.

The AAO conducted an investigation of Ms. Weigert's complaint, during which time Ms. Weigert took paid administrative leave. Id. The AAO concluded that there was "no evidence to support [the plaintiff's] complaint of discrimination based on disability, harassment, and retaliation." Mot. for Summ. J., Ex. 20, Findings on Ms. Weigert's Discrimination Complaint, January 20, 1993. In late January, after the AAO issued its determination, Ms. Weigert received a departmental memorandum regarding her inappropriate behavior. See Mot. for Summ. J. at 16, Ex. 22, Departmental Memorandum, January 26, 1993. Ms. Weigert returned to work in February 1993. See id. Ms. Weigert also received an annual performance evaluation stating that she had not met the University's standards for affirmative action because of her previous racially and ethnically insensitive remarks directed at African–Americans. See Mot. for Summ. J. at 16.

After the AAO inquiry, departmental memorandum and performance evaluation,

---

1. The plaintiff also alleged a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"). By Order dated July 26, 1999, the court granted the defendant's motion for summary judgment on the plaintiff's Title VII claim.

additional incidents between Ms. Weigert and her co-workers and supervisors ensued. *See* Mot. for Summ. J. at 18–20. For example, one employee expressed concern that Ms. Weigert might try to physically harm a co-worker. *See* Reply in Support of Defendants' Motion for Summary Judgment ("Reply") at 15. On April 30, 1993, after receiving reports of such incidents, the defendant informed Ms. Weigert of her termination. *See* Mot. for Summ. J. at 19–20.

## III. ANALYSIS

### A. Legal Standard

Summary judgment is proper and the movant is entitled to judgment as a matter of law when the movant proves that based on the pleadings, depositions and other evidence submitted to the court, there is no genuine issue as to material fact. *See* FED. R. CIV. P. 56(c). The movant has the burden of establishing that no genuine issue of material fact is in dispute. *See* FED. R. CIV. P. 56(c); *National Cable Television Ass'n., Inc. v. FCC*, 479 F.2d 183, 186 (D.C.Cir.1973). The substantive law on which a claim rests determines which facts are "material." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a fact bears on an essential element of a claim or defense, then it is material. *See id.; Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In addition, "[a]ll evidence and the inferences drawn therefrom must be considered in the light most favorable to the non-moving party." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Childers v. Slater*, 44 F.Supp.2d 8, 15 (D.D.C.1999). For any non-movant, "including a discrimination plaintiff, to survive a motion for summary judgment, he must do more than present conclusory allegations of discrimination; concrete particulars must be presented to substantiate the discrimination claim." *Siragy v. Georgetown Univ.*, 1999 WL 767831, at *2 (D.D.C. Aug. 20, 1999) (citing *Kalekiristos v. CTF Hotel Management Corp.*, 958 F.Supp. 641, 645 (D.D.C.1997)).

The D.C. Circuit has observed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary judgment motions in such cases with special caution. *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C.Cir.1997), *vacated o.g.*, 156 F.3d 1284 (D.C.Cir.1998); *Johnson v. Digital Equip. Corp.*, 836 F.Supp. 14, 18 (D.D.C. 1993).

### B. Exhaustion of Administrative Remedies and Timely Filing of a Charge

The defendant contends that Ms. Weigert failed to exhaust her administrative remedies because she did not file a charge with the EEOC within 300 days of making her last request for accommodation from her employer. *See* Mot. for Summ. J. at 2–3. Ms. Weigert responds that she filed an EEOC complaint on December 30, 1993, after her alleged discriminatory or retaliatory discharge on April 30, 1993, thereby satisfying the 300–day time period. *See* Opp'n at 44–45. She further states that her claim is not based on the defendant's failure to grant her requests for reasonable accommodations.[2] *See* Opp'n at 52. The defendant thereafter replies that it mistakenly believed that the plaintiff was asserting a reasonable-accommodation claim and that, in light of the plaintiff's assertion, the court need not consider its exhaustion argument.[3] *See*

---

2. The court additionally notes the plaintiff's statement that the instant complaint does not allege disparate treatment. *See* Opp'n at 53.

3. The defendant states that it does not contend that the plaintiff's discriminatory-discharge claim was time-barred. *See* Def.'s Reply at 13 n. 7.

Def.'s Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") at 13 n. 7. Because the parties agree that the plaintiff has not alleged a reasonable accommodation claim, the defendant's motion for summary judgment for failure to exhaust administrative remedies is denied.

### C. Claims under the Americans with Disabilities Act

The purpose of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. §§ 12112(a) and 12203, is broad and remedial and is designed to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12112(a). To accomplish this purpose, the ADA prohibits employers from discriminating against a "qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112. The ADA defines disability in relevant part as "a physical or mental impairment that substantially limits one or more of [a person's] major life activities." 42 U.S.C. § 12102(2)(A), (C). However, Congress specifically limited the ADA's protection to those "qualified individuals with a disability" who, with or without reasonable accommodation, can perform the essential functions of the positions they hold. 42 U.S.C. § 12111(8). The ADA provides that consideration be given to the employer's judgment in determining what functions are essential. *See* 42 U.S.C. § 12111(8).

### D. Disability Discrimination

For ADA claims, this court has adopted the Supreme Court's approach in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), "the seminal case establishing the burden of proof in employment discrimination cases under Title VII." *Whitbeck v. Vital Signs, Inc.*, 934 F.Supp. 9, 13 (D.D.C.1996); *see also Miller v. American Coalition of Citizens with Disabilities*, 485 A.2d 186, 189 (D.C.1984). Under this test, a plaintiff must establish, by a preponderance of the

evidence, a prima facie case of discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff has the initial burden of showing that a reasonable juror could find that she (1) has a disability within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the position with or without reasonable accommodations; and (3) was discharged because of her disability. *See Swanks v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 933 (D.C.Cir.1999).

After the plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for its challenged employment practice. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C.Cir.1998). Should the employer succeed in presenting such a reason, the burden shifts back to the plaintiff to establish that the articulated reason is pretextual. *See id.* The purpose of this framework is "to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Consequently, "an employer's fear that the jury will draw an adverse inference from a false explanation is a vital element of the *McDonnell Douglas* burden-shifting procedure. Without it, employers would have little incentive to look for and present the real reasons for their employment decisions." *Aka*, 156 F.3d at 1293.

The plaintiff's "attack on the employer's explanation must always be assessed in light of the total circumstances of the case." *Id.* at 1291. These circumstances include "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120

S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000). Additionally, a plaintiff is not required to introduce additional, independent evidence of discrimination at this point to avoid summary judgment. *See id.* at 2109.

### 1. Ms. Weigert Must First Establish That She Was Disabled

To establish the first element of a prima facie case, an individual must show that she is disabled within the meaning of the ADA. A plaintiff is disabled if she: (1) has a physical or mental impairment that substantially limits one or more of her major life activities; (2) has a record of such an impairment; or (3) has been regarded as having such an impairment. *See* 42 U.S.C. § 12102(2)(A)-(C); *see also Siragy,* 1999 WL 767831 at *2. In this case, Ms. Weigert has alleged facts that satisfy the first and third prongs of this definition. *See* Opp'n at 38.

### a. Physical or Mental Impairment

 The inquiry into a claim of physical or mental impairment consists of a two-part analysis. Ms. Weigert must establish both the existence of an impairment and that the impairment substantially limited one or more of her major life activities. *See Kalekiristos v. CTF Hotel Management Corp.,* 958 F.Supp. 641, 656 (D.D.C. 1997); *accord Harris v. H & W Contracting Co.,* 102 F.3d 516, 520 (11th Cir.1996). Under the ADA, Ms. Weigert "has the burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination." *Kalekiristos,* 958 F.Supp. at 657. Whether a plaintiff is "disabled" as a matter of law is a "highly fact-sensitive issue, requiring an individualized inquiry and case by case determination." *Dutton v. Johnson Cty. Bd. of Cty. Commissioners,* 859 F.Supp. 498, 506 (D.Kan.1994). In this case, Ms. Weigert alleges that she suffered from four disorders: an unspecified neurological condition; hypothyroidism; impairment from her medications; and claustrophobia.

### i) Hypothyroidism

Ms. Weigert alleges that she suffered a physical impairment in the form of an endocrine disorder known as hypothyroidism.[4] Accordingly, she has the burden of establishing that she had this impairment during the term of her employment.[5] *See Kalekiristos,* 958 F.Supp. at 657. In October 1992, a nuclear medicine scan indicated that Ms. Weigert's thyroid was "completely normal." *See* Deposition of Dr. Priscilla Dale, May 9, 2000 ("Dale Dep.") at 22. While employed by the defendant, Ms. Weigert also underwent blood tests which showed no sign that she had hypothyroidism or that "she might develop it within the near future." Dale Dep. at 30.

According to Ms. Weigert's current treating physician, the symptoms she suffered while employed by the defendant are consistent with a diagnosis of hypothyroidism. *See* Opp'n at 46 (citing Affidavit of Kenneth C.N. Chen, M.D., dated June 16, 2000, ¶ 5). The plaintiff also submits the pharmacological findings of her expert, Dr. Emmeline Edwards, to demonstrate that some of the medicines she was taking had the potential to alter the results of a thyroid function test. *See* Opp'n at 45–46

---

4. Hypothyroidism is a condition associated with a deficiency in thyroid secretion, resulting in a lowered basal metabolism. Common symptoms of hypothyroidism include obesity, dry skin and hair, low blood pressure, slow pulse, sluggishness of all functions, depressed muscular activity, and goiter. *See* TABER'S CYCOPEDIC MEDICAL DICTIONARY, at 879 (16th ed.1989).

5. The Code of Federal Regulations ("C.F.R.") defines "impairment" to include any physiological disorder or condition affecting a variety of listed body systems, including the endocrine. *See* 29 C.F.R. § 1630.2(h)(i). The thyroid gland is part of the endocrine system. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 552 (28th ed.1994). Therefore, a disorder of the thyroid would fall within the meaning of impairment as defined by the federal regulations.

(citing Deposition of Emmaline Edwards, dated March 22, 2000, at 42–43). The court notes that the latter submission is mere speculation that cannot meet the plaintiff's burden of "establishing with medical evidence the existence of the alleged disability." *Kalekiristos,* 958 F.Supp. at 657.

◼ In any case, the plaintiff's claim is defective for a more fundamental reason. The reports of her current treating physician and expert, which constitute the sole evidence proffered in support of the hypothyroidism diagnosis, were prepared after the plaintiff was terminated from her job. "[R]eports about which the defendant employer had absolutely no knowledge nor access prior to terminating the plaintiff cannot serve as the sole evidentiary basis of establishing an element of a prima facie case of disability discrimination." *Id.* Accordingly, the plaintiff has failed to establish that she suffered a thyroid-related disability during her employment.

Ms. Weigert cites *Dotson v. Electro–Wire Products,.* 890 F.Supp. 982, 987 (D.Kan.1995), for the premise that the existence of a disability does not depend so much on the name or diagnosis of the impairment as it does on the effect the impairment has on an individual. *See* Opp'n at 45. However, the plaintiff's reliance on *Dotson* is misplaced. · Although the ADA does "not attempt a laundry list of the impairments that are disabilities," 29 C.F.R. § 1630.2(j), the plaintiff must present evidence contemporaneous with the relevant employment period. Indeed, the C.F.R. and *Dotson* require the plaintiff to establish the threshold diagnosed impairment. Because both experts prepared their reports after the plaintiff was terminated, they cannot alone establish her physical impairment. The court thus concludes that Ms. Weigert has not established that she had hypothyroidism at the

time of her employment and that, as such, she was not disabled from this condition within the meaning of the ADA.

### ii) Neurological Disability

Ms. Weigert claims that shortly after she was hired she informed Dr. Green that she had a neurological disability.[6] *See* Deposition of Susan Weigert ("Weigert Dep."), dated March 13, 2000, at 186. Specifically, she asserts that she could not tolerate fluorescent lighting or glare from other light and that when she was exposed to these lighting situations, she developed migraine headaches. *See* Opp'n at 46. Dr. Behlmer, the plaintiff's neurologist during the period she was employed by the defendant, contradicted Ms. Weigert's assertions, testifying that "every study [conducted on the plaintiff] was normal;" her "neurological exam was normal and nothing clinically about her indicated definite neurological disease." Deposition of Patricia Behlmer, M.D., dated April 26, 2000 ("Behlmer Dep.") at 40. Despite her findings, Dr. Behlmer provided a note to the defendant in September 1992 indicating that "for health reasons. Ms. Weigert should utilize incandescent, not fluorescent lights." Behlmer Dep. at 53. Although Dr. Behlmer states that she wrote the note solely on the basis of what the plaintiff had told her, *see* Behlmer Dep. at 55, this note could constitute medical evidence demonstrating to her employer that she had a physical limitation. Additionally, a November 1992 file memo of Tillie Pope, an AAO employee who investigated the plaintiff's complaint, states that "[b]ecause of a neurological disorder, [the plaintiff] asked that the fluorescent lights in her office be switched to incandescent lights. [The plaintiff] was getting sick at work because of the lights, and had her doctor write a letter documenting her disorder and explaining how the change of lights would help her." Opp'n, Ex. 15. Viewing the

6. The defendant states that Dr. Green does not recall precisely when Ms. Weigert informed her of this neurological condition, *see* Mot. for Summ. J. at 4 n. 1, but in accordance with Fed.R.Civ.P. 56, the court accepts the plaintiff's testimony as accurate for purposes of this motion.

evidence in the light most favorable to the nonmoving party, Ms. Weigert has presented medical documentation that could allow a reasonable factfinder to find that she experienced some type of neurological impairment during her term of employment. Accordingly, the court determines that Ms. Weigert has demonstrated the first part of the ADA's disability analysis.

### iii) Medications

■ Ms. Weigert claims that she suffered an impairment that compelled her to use medications or alternatively, that the medication itself caused an impairment. *See* Opp'n at 34. She states that she informed her supervisors that she experienced adverse side effects and that the behavior she exhibited was caused by her medications and a thyroid condition. *See* Opp'n at 4, 11. Such side effects and behavior, according to the plaintiff, gave rise to a medical condition that impaired her and constituted a disability. Disabilities, however, are to be evaluated based on the plaintiff's unmedicated state. *See Matczak v. Frankford Candy and Chocolate Co.,* 136 F.3d 933, 937 (3d Cir.1997); 29 C.F.R.App. § 1630.2(j). Therefore, the plaintiff must establish that she had an impairment requiring medication. Ms. Weigert has failed, however, to provide any documentation that she had a disability or impairment necessitating medication.[7] Moreover, Dr. Behlmer testified that there was no "documentation of a condition for which these drugs would be required." Behlmer Dep. at 89.

Ms. Weigert alleges that the fact that her medications were legally prescribed and that she worked with her physicians to adjust the dosages is further evidence of her disability. *See* Opp'n at 50. Yet the "mere use of a mitigating measure does not automatically prove the presence of a disability, because some persons may use such measures to alleviate impairments that are not substantially limiting." *Harris v. H & W Contracting Co.,* 102 F.3d 516, 521 (11th Cir.1996). Had Ms. Weigert submitted evidence of an underlying impairment requiring these medications, she could argue that the treatment was disabling within the meaning of the ADA. *See Christian v. St. Anthony Med. Ctr., Inc.,* 117 F.3d 1051, 1052 (7th Cir.1997). However, because Ms. Weigert fails to meet the threshold impairment, she cannot claim that her attempts to medically control the impairment gave rise to a disability.[8]

■ Ms. Weigert also asserts that the medications may have caused a disability of their own accord. *See* Opp'n at 34. However, when the use of medication is not caused by a mental or psychological disorder, a condition that results from its use does not qualify as a disability under the ADA. *See* C.F.R.App. § 1630.2(h). The plaintiff has not demonstrated that she had an underlying mental or psychological disorder that precipitated the use of medication.[9] Thus, the effects or condi-

---

7. *See, e.g., Hill v. Kansas City Area Transp. Authority,* 181 F.3d 891 (8th Cir.1999) (affirming dismissal of plaintiff's claim because there was no evidence of a physical condition that compelled the plaintiff to take a combination of medications that affected her ability to stay awake on the job).

8. Ms. Weigert later claims that she took Ritalin for narcolepsy, although she repeatedly declined to be tested for this condition and thus, under this same standard, cannot assert that this medicine was utilized to treat that disability. She also states that she took Prozac for depression, but does not allege that she was discriminated against because of her depression. *See* Weigert Dep. at 55–57. The

court notes that Dr. Behlmer and Dr. Dale now assert that Ms. Weigert may have a borderline personality disorder. *See* Behlmer Dep. at 66–68; Dale Dep. at 38, 51. Although a borderline personality disorder may constitute an impairment, Ms. Weigert has not alleged that she suffers from this disorder or that it substantially limited her. Therefore, it cannot constitute a disability under the ADA. *See Hatfield v. Quantum Chemical Co.,* 920 F.Supp. 108 (S.D.Tex.1996).

9. Additionally, "even though a person may be taking drugs pursuant to a physician's or other health care professional's supervision, if misrepresentation or deceit is involved in obtaining such drugs," that person is not afford-

tions, if any, that resulted from the use of the medications cannot constitute a disability. The court rules that Ms. Weigert has failed to establish a prima facie case on this ground.

### iv) Claustrophobia

Ms. Weigert asserts that she suffered from claustrophobia during her employment as a result of the installation of dividers in her office, and that she submitted a note to her employer from her internist, Dr. Dale, to that effect ("Dale note"). *See* Opp'n at 53. The Dale note states that Ms. Weigert called the doctor's office "noting severe claustrophobia." The Dale note, however, does not document any finding by Dr. Dale. *See* Mot. for Summ. J., Ex. 17, Verification of Treatment note, Nov. 6, 1992. In response to questions submitted by the AAO, Dr. Behlmer submitted a letter stating that "[Ms. Weigert] gets claustrophobic" as a result of the barriers in her office. *See* Opp'n at 53, Ex. 21 (Letter from Patricia Behlmer, M.D., to Rosemary Diaz, December 22, 1992). Viewing the facts most favorably for this plaintiff, the court concludes that Ms. Weigert has demonstrated that she suffered from claustrophobia.

### b. The Impairment Must Substantially Limit a Major Life Activity

Ms. Weigert has established facts that could support the inference that she suffered a physical or mental impairment caused by a neurological disorder and claustrophobia. Proving the existence of an impairment, however, is only part of Ms. Weigert's burden in demonstrating that she has a disability under the ADA. *See Harris v. H & W Contracting Co.*, 102 F.3d 516, 520 (11th Cir.1996). Many impairments do not affect an individual's life

to the degree that they constitute disabling impairments. *See* 29 C.F.R.App. § 1630.2(j). For an impairment to constitute a disability, the ADA requires that the plaintiff show the impairment substantially limited one or more of her major life activities. *See Kalekiristos*, 958 F.Supp. at 656.

Although the ADA does not define the terms "substantially limits" or "major life activity" in its definition of impairment, *see Siragy*, 1999 WL 767831 at *3, the Equal Employment Opportunity Commission ("EEOC") has issued regulations that elaborate on the meaning of these terms. *See Venclauskas v. Connecticut Dep't of Public Safety*, 921 F.Supp. 78, 81 (D.Conn. 1995). For example, the EEOC defines an individual as substantially limited when she is "[u]nable to perform a major life activity that the average person in the general population can perform" or when she is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The EEOC defines major life activities non-exhaustively as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at § 1630.2(i).

The defendant contends that Ms. Weigert cannot establish that she was substantially limited in her major life activities. *See* Mot. for Summ. J. at 25. The defendant offers proof of its position through citations to the record, which show that Ms. Weigert worked a 40–hour work week throughout her employment, commuted 45 minutes in each direction, cared for her children, took graduate courses at Georgetown University, studied karate, and vaca-

---

ed the protection of the ADA. *McDaniel v. Mississippi Baptist Med. Ctr.*, 869 F.Supp. 445, 449 (S.D.Miss.1994). Dr. Behlmer's testimony reveals that:

- Ms. Weigert did not inform her of all of the medicines that had been prescribed by other doctors

- Ms. Weigert's refills were "excessive"
- Ms. Weigert was using pressure tactics or [was] forcing her to refill her medications
- It appeared that Ms. Weigert was taking more medication than prescribed

*See* Behlmer Dep. at 37, 78, 79, 87–88, 89, 90, 107–108, 112–13.

tioned at the beach. *See* Mot. for Summ. J. at 25–26. Ms. Weigert responds that she was impaired in each of these activities. Specifically, she claims that she had trouble with the sunlight while driving, struggled with her course work, needed her husband's help with the children, and quit her karate lessons at least in part because of her illness. *See* Opp'n at 47–48. Ms. Weigert also states that she tried to avoid the sunlight during beach vacations by wearing a hat or sunglasses. *See id.*

In *Lajaunie v. Hibernia Corp.*, 2000 WL 145362 (E.D.La. Feb. 8, 2000), the court determined that a plaintiff was not materially hampered in the performance of life activities under circumstances similar to the plaintiff's. In *Lajaunie*, the plaintiff was diagnosed with corneal disease, which gave her problems with glare. The court determined that she was neither substantially limited nor materially hampered, although it was clear that because of the glare "she [could] no longer work in the garden, ride a bicycle and do crossword puzzles." *Id.* at *6. The court relied on the plaintiff's doctor's report, which stated that the plaintiff's condition did not cause "ocular damage," notwithstanding the fact that her condition "could be extremely uncomfortable and quite distracting." *Id.* In dismissing her claims, the court held that to find that the plaintiff was "substantially limited" would dilute the meaning of "substantially limited" to simply "limited." *See id.*

After careful review of the facts and law, the court determines that Ms. Weigert was not substantially limited in the performance of major life activities, despite the fact that she may have experienced discomfort from the various lighting conditions. She was able to commute to work and did not, for example, use alternative transportation to protect herself or others from her reaction to sunlight or glare. *See* Weigert Dep. at 116. Moreover, she took vacations at the beach where the sun and glare from the water could have exacerbat-

ed her condition. *See* Weigert Dep. at 8, 46–48, 573. Ms. Weigert contends that her illness jeopardized the completion of her studies, yet she does not say how. For example, she did not attempt to ameliorate the lighting conditions in her classrooms. Indeed, she testified that she would "just step out as needed" if the fluorescent lights in the classroom affected her. Finally, Ms. Weigert's husband's testimony that his wife could not work for prolonged periods does not suffice to establish a substantial limitation in a major life activity. *See* Deposition of Stephen Weigert, April 7, 2000, at 36–37. Rather, the record discloses that the plaintiff maintained a full-time work schedule, cared for four children with the help of her husband, and pursued a graduate course load during the relevant time. In view of the record, the court determines that the plaintiff was not substantially limited in the performance of major life activities.

■ If an individual is not substantially limited with respect to any major life activity, the court should consider the individual's ability to perform the major life activity of working. *See* 29 C.F.R.App. § 1630.2(j). Ms. Weigert contends that she was substantially limited in working and that her "disabilities would have prevented her from working in any job while her symptoms were plaguing her since fluorescent lights anywhere affected her." Opp'n at 34, 49. To establish a substantial limitation on the ability to work, the individual must be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person with comparable training, skills and abilities. *See* 29 C.F.R. § 1630.2(j)(3)(i); *see also Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 487 (8th Cir.1996) (citing other cases where plaintiffs did not prove substantial limitation because they could not establish that they were restricted in performing a class of jobs).[10] The ADA does not require

---

10. The inability to perform a single, particular job does not constitute a substantial limi-

an onerous evidentiary showing. Rather, the plaintiff need only present evidence of general employment demographics and/or recognized occupational classifications that indicate the approximate number of jobs from which her impairment would exclude her. *See* 29 C.F.R.App. § 1630.2(j). The plaintiff has not demonstrated that as a research assistant, she would be unable to obtain jobs in other locations or in the area of her expertise. *See* 29 C.F.R. § 1630.2(j)(3)(ii). She has not shown that her conditions would have constituted a significant barrier to employment. *See Forrisi v. Bowen,* 794 F.2d 931, 933 (4th Cir.1986). Finally, she does not indicate that her doctors disqualified her from any jobs at the time of her employment by the defendant. *See Kalekiristos,* 958 F.Supp. at 658. The broad assertion that fluorescent lights are everywhere does not indicate that Ms. Weigert was significantly restricted from performing a broad class or range of jobs. Accordingly, the court rules that Ms. Weigert was not substantially limited in the major life activity of working.

Because Ms. Weigert has failed to establish that her neurological disorder or claustrophobia substantially limited her ability to work or perform other life functions, the court determines that she is not disabled within the meaning of the ADA. The plaintiff thus fails to establish a prima facie case of discrimination on the basis of a physical or mental impairment.

### c. Perceived Disability

Ms. Weigert contends that the defendant improperly regarded her as having disabilities that she did not have within the meaning of the ADA. *See* Opp'n at 38. Specifically, Ms. Weigert asserts that the defendant's managers and some of her colleagues believed she was mentally ill,

paranoid or had an underlying psychiatric disorder. *See* Opp'n at 39. Congress intended the "regard as" definition to protect people from a range of discriminatory conduct based on "myths, fears and stereotypes" about disability that can occur even when a person does not have a substantially limiting impairment. 29 C.F.R. § 1630.2(*l* ). Under the ADA, an individual is "regarded as having an impairment" if she satisfies one of three conditions:

(1) a physical or mental impairment that does not substantially limit major life activities but is treated by [her employer] as constituting such limitation;

(2) a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) none of the impairments defined [as a physical or mental impairment] but is treated by [her employer] as having a substantially limiting impairment.

*See* 29 C.F.R. § 1630.2(*l* )(1).

In order to "fall within the 'regarded as' definition, the plaintiff must prove that the defendant considered the plaintiff's impairment to foreclose not simply a particular job, but the type of employment generally involved." *Venclauskas,* 921 F.Supp. at 82. An employee is not "regarded as disabled," however, merely because an employer acts in response to restrictions imposed by an employee's physician. *See Gerdes v. Swift–Eckrich, Inc.,* 125 F.3d 634, 638 (8th Cir.1997) (although doctor's restrictions prevented employee from working in certain jobs, the employee did not demonstrate that he was perceived to be disabled because he did not present evidence that the employer considered him

tation in the major life activity of working. *See* 29 C.F.R. § 1630.2(j)(3)(i); *see also Halperin v. Abacus Technology Corp.,* 128 F.3d 191, 199 (4th Cir.1997) (the inability to perform a particular job does not qualify a person as disabled under the ADA); *Bridges v. City of*

*Bossier,* 92 F.3d 329 (5th Cir.1996) (one who is disqualified from holding a narrow range of jobs is not substantially limited in the major life activity of working and, therefore, is not disabled under the ADA); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir.1995).

unable to work at a broad class or range of jobs). Moreover, an employer's attempts to accommodate an employee's concerns and perceived needs do not establish that the employer regarded the employee as having a disability. *See Muller v. Automobile Club*, 897 F.Supp. 1289, 1298 (S.D.Cal.1995) (employer did not perceive that employee was disabled based on its efforts to accommodate). Additionally, the employer must not just erroneously believe that the employee has an impairment, but must believe that this impairment substantially limits her major life activities. *See Richards v. City of Topeka*, 173 F.3d 1247, 1251 (10th Cir.1999).

Ms. Weigert has not presented any evidence that the defendant regarded her as having an impairment that would foreclose her employment as a research assistant. Nor has the plaintiff shown that her employer "perceived or believed" that she had an impairment that substantially limited her major life activities, notwithstanding its accommodations to the plaintiff as a result of her expressed concerns and her doctor's requests. Indeed, the record demonstrates that Ms. Weigert's supervisors and colleagues believed that she was exaggerating or fabricating her claims and repeatedly expressed skepticism toward these claimed disabilities. For example, on one occasion. Ms. Spertus, who shared an office with the plaintiff, expressed disbelief in the plaintiff's sickness and exclaimed that she was "sick of [her] [expletive]." *Id.* at 6. Dr. Goldberg, one of her supervisors, apparently told the plaintiff that she could participate in discussions about her accommodations only if she had a "truly 'documented disability.'" *Id.* at 15. Even the plaintiff states in her opposition that Dr. Green "responded in disgust, 'So now you've got claustrophobia—a new disability,'" and that Ms. Gearhart, a co-worker, "expressed her belief that plaintiff's illness was most likely in her head." Opp'n at 39 and n. 14.

The deposition testimony of Ms. Weigert's supervisors further substantiates this skepticism. Ms. Weigert testified that her supervisor, Dr. Green, stated that her own husband and daughter took Ritalin but that she did not observe them behaving the way Ms. Weigert did. *See* Weigert Dep. at 211. Ms. Mahin, a supervisor at the defendant's Labor Relations office, also testified that she did not recall Dr. Green or Dr. Goldberg ever telling her that they believed Ms. Weigert was mentally ill. *See* Deposition of Mary Anne Mahin, ("Mahin Dep."), Feb. 17, 2000, at 56–57. Additionally, a co-worker, Rochelle Silver, testified that she did not believe Ms. Weigert was mentally ill or that Ms. Weigert manifested any symptoms of psychological disorders. *See* Deposition of Rochelle Silver, April 13, 2000, at 16.

Even the plaintiff's complaint undermines her "perceived disability" theory by conceding that "[a]t various times many of plaintiff's co-workers and supervisors stated that they believed that her disability was psychosomatic and that her need for accommodation was due to 'manipulativeness.'" Compl. ¶ 44. In her answers to interrogatories, Ms. Weigert stated that Dr. Rowland, her co-worker's supervisor, "expressed her belief that the plaintiff's request for incandescent lighting was merely her way of trying to control [her co-worker]" and that the plaintiff should not be accommodated unless she had indicated on her employment application that she was disabled. *Id.* at 5 (citing Exhibit 1 at 18, Plaintiff's Answers to Interrogatories).

On this record, the plaintiff has failed to establish that her co-workers and supervisors perceived her as having a disability that she did not have. Even assuming *arguendo* that the plaintiff had a "perceived disability," she has not proffered evidence that her employers believed she was substantially limited in her ability to perform a major life activity or that they believed the impairment foreclosed her type of employment in general. Consequently, the plaintiff has failed to establish the existence of a "perceived disability" so

**14**

as to state a prima facie claim under the ADA.

### 2. The Plaintiff Must Be Able to Perform the Essential Functions of Her Job

 The court has already determined that Ms. Weigert is not disabled within the meaning of the ADA. Alternatively, the court determines that the plaintiff has not demonstrated the second element of a prima facie case under the ADA. To demonstrate that she is a "qualified individual with a disability," Ms. Weigert must show that a reasonable jury could find that she could perform, with or without reasonable accommodation, the "essential functions" of her job. 42 U.S.C. § 12111(8).[11] In "accord with this definition, handicap discrimination laws protect only those who can do their job in spite of their handicap, not those who could do it but for their handicap." *Fields v. Lyng,* 705 F.Supp. 1134, 1136 (D.Md.1988) (citing *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)). "Essential functions" are defined by the EEOC regulations as "the fundamental duties of the employment position the individual with a disability holds" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Courts defer "to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8); *Kalekiristos,* 958 F.Supp. at 660. The function may also be essential because the reason the position exists is to perform that function, because of the limited number of employees among whom the performance could be distributed and because the person is hired for her ability to perform the particular function. *See* 29 C.F.R. § 1630.2(n)(i-iii). Other evidence may also be relevant, including written job descriptions, the amount of time spent performing the function and the consequences of not performing the function.

According to the defendant, the research division "consisted of several faculty, research assistants, and administrative personnel who collaborated with each other on a number of funded research projects." Mot. for Summ. J. at 2. Further, given the "nature of the scientific inquiry in a research setting, coupled with the small size of the research division, it was absolutely essential that the members of the research division be able to work cooperatively and collegially with each other." *Id.* at 2–3. Therefore, the defendant asserts, the ability to work cooperatively with her colleagues as a research assistant was an essential function of her job. *See id.* at 29. The plaintiff corroborates this assertion through testimony that "essential teamwork will be the key to our success," that the scientific endeavor they were involved in "is about teamwork," and that the ability to resolve problems "directly person to person" and the team's professionalism were critical to the success of the work in the department. *See* Weigert Dep. at 232–33.

Numerous courts have held that technical skills and experience are not the only essential requirements of a job and that stability and the ability to interact with coworkers and supervisors can constitute an essential function. *See Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 674–75 (1st Cir.1995) (plaintiff incorrectly assumed essential functions of shift electrician only included technical ability and experience while the ability to get along with co-workers and supervisor also constituted essential functions); *Pesterfield v. Tennessee Valley Auth.,* 941 F.2d 437, 441–42 (6th Cir.1991) (at least the ability to get along with supervisors and co-workers was essential function of job as tool-room attendant); *Mancini v. General Elec. Co.,* 820 F.Supp. 141, 147 (D.Vt.1993) (ability to follow the orders of superiors is an essen-

11. *See also Howard v. North Miss. Med. Ctr.,* 939 F.Supp. 505, 509 (N.D.Miss.1996) (an individual who is disabled must be able to perform the essential functions of her job to receive the protection afforded by the ADA).

tial function of any position); *Pickard v. Widnall,* 1994 WL 851282, at *9 (S.D.Ohio, Dec. 15, 1994) (mental and emotional stability was essential job function for military position); *Voytek v. University of California,* 1994 WL 478805, at *15 (N.D.Cal., Aug. 25, 1994) (employee legally denied re-employment after period of disability where he could not continue to perform all the tasks assigned to him, due in part to the ongoing conflict with his supervisor). Therefore, the court determines that Ms. Weigert's ability to interact with her co-workers and supervisors in a non-disruptive and non-abusive fashion was an essential function of her job.

■ The court must inquire next whether a reasonable jury could find that the plaintiff would have been able to perform this essential function had she been given reasonable accommodations by the defendant. *See Hill v. Kansas City Area Transp. Authority,* 181 F.3d 891, 894 (8th Cir.1999). In *Hill,* the plaintiff's hypertension medication impaired her ability to perform an essential job function. The plaintiff alleged that her employer violated the ADA by not accommodating the limitations of this disability. *See id.* at 893. The court of appeals, in affirming the district court's grant of summary judgment, stated that the defendant-employer "controlled [the plaintiff's] work conditions, but it was not her doctor or pharmacist." *Id.* at 894.

As such, the court of appeals held that any "reasonable accommodation requested was not within her employer's control." *Id.*

Ms. Weigert similarly asserts that the medicines she took, and which she alone had control over, interfered with the normal, interactive functions of her job.[12] As in *Hill,* this court cannot discern any accommodation that the defendant or its employees could have instituted to control Ms. Weigert's consumption of medication that would have permitted her to perform the essential function of compatibly interacting with her co-workers and supervisors. Moreover, courts "have consistently held that one who displays abusive and threatening conduct toward co-workers is not an otherwise 'qualified individual.'" *Palmer v. Circuit Court of Cook County,* 905 F.Supp. 499, 508 (N.D.Ill.1995) (plaintiff's continued disruptive and abusive behavior and inability to deal with co-workers in a civil manner is not a qualified individual). The court therefore determines that Ms. Weigert has failed to establish that she could have performed the essential function of compatibly interacting with her co-workers and supervisors.[13]

### E. Retaliatory Discrimination

■ Ms. Weigert alleges that the defendant retaliated against her in violation of the ADA. The ADA's retaliation provi-

---

12. Ms. Weigert testified that she was forced to take her medications because, without them, particularly the Ritalin, she "really couldn't function in the office in a productive way." *See* Weigert Dep. at 325. She testified that her medicines made her "jumpy, literally, made [her] appear nervous." Weigert Dep. at 211. And when the plaintiff added Prozac to her regimen, she thought "it had the effect of altering her mood at times" and caused her moods to shift "rather rapidly." *Id.* at 211–12. The medications also caused Ms. Weigert to "snap at [her] office mate in a way which [she] would not have done had [she] not been on that medication." *Id.* at 323. When Dr. Green indicated that the plaintiff's tone of voice seemed threatening, according to the plaintiff, she [Ms. Weigert] reminded Dr. Green that the Ritalin was probably affecting her. *See* Opp'n at 12.

13. The defendant asserts that even if Ms. Weigert was a qualified individual with a disability, it reasonably accommodated her. The plaintiff responds that she does not make a claim based on the defendant's failure to grant her requests for reasonable accommodations. *See* Opp'n at 52. In any event, "it is necessary that an individual be a qualified individual with a disability before a defendant has a duty to accommodate." *Smith v. Blue Cross Blue Shield of Kansas, Inc.,* 894 F.Supp. 1463, (D.Kan.1995) (citing *Bolton v. Scrivner, Inc.,* 836 F.Supp. 783, 789 n. 4 (W.D.Ok. 1993)). Because the court "has found plaintiff was not a qualified individual with a disability, the issue of reasonable accommodation is not relevant." *Id.*

sion protects any individual who "has opposed any act or practice made unlawful by [the ADA] or ... has made a charge [under the ADA]." 42 U.S.C. § 12203(a). Moreover, the ADA incorporates the "the powers, remedies, and procedures" of Title VII. Thus, a plaintiff bringing an ADA retaliation claim may rely on the burden-shifting method set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Henry v. Guest Services, Inc.*, 902 F.Supp. 245, 250 (D.D.C.1995); 42 U.S.C. § 12117(a). To establish a prima facie case of retaliation under this statutory scheme, Ms. Weigert must show that (1) she engaged in a statutorily protected activity; (2) the defendant took an adverse action against her; and (3) a causal connection existed between the protected activity and her employer's action. *See Commeree v. Hantman*, 1999 WL 1611325, at *3 (D.D.C. Oct. 28, 1999). After the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retalia-

tory reason for its actions. *See McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir. 1984). At that point, the plaintiff must prove that the proffered reason was a pretext for retaliation. *See id.*

■ At the outset, the court holds that Ms. Weigert satisfies the first requirement of a prima facie case of retaliation, because complaining of disability discrimination and filing an administrative complaint are protected activities.[14] *See* Compl. ¶ 278; *Commeree*, 1999 WL 1611325 at *3.[15]

### 1. Adverse Action

As adverse actions, the plaintiff alleges that she was issued a departmental memorandum containing a low performance evaluation, that she was given less substantial work assignments after her return from administrative leave, and that she was denied secretarial support and was ultimately discharged.[16] *See* Opp'n at 54–56. The parties do not dispute that Ms. Weigert was terminated from her position,

14. The defendant correctly asserts that the plaintiff must have a good-faith and reasonable belief that her employer engaged in unlawful discrimination practices. *See* Mot. for Summ. J. at 39; *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1459–60 (7th Cir.1995). The plaintiff must also show that her belief was objectively reasonable in light of the facts and record presented. *See* Mot. for Summ. J. at 39; *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir.1997). Contrary to the defendant's assertion, however, the court finds nothing in the record to indicate that Ms. Weigert did not have an objectively reasonable belief that her employer was engaged in unlawful discrimination. Moreover, Ms. Weigert received accommodations for her alleged disabilities, giving further credence to her belief. The court finds that the allegations and record indicate that "the belief, though perhaps mistaken, was objectively reasonable." *Little*, 103 F.3d at 960.

15. The defendant asserts that because Ms. Weigert's behavioral and interaction problems began months before she filed her complaint with the AAO, she is not entitled to the anti-retaliatory protection afforded under the ADA. *See* Reply at 21–22. However, within a few months after commencing her employment, Ms. Weigert requested accommodations from the defendant. Requesting an accom-

modation for a disability may also be a protected activity. *See Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir.1997) (it would seem anomalous to think that Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge). Therefore, the court finds no merit in the defendant's argument that the plaintiff is prohibited from asserting a retaliation claim under the ADA on this ground.

16. The plaintiff also contends that her supervisors and co-workers expressed animosity toward her. *See* Opp'n at 56. Given Ms. Weigert's appraisal of the people she worked with, and the documented behavior on this record, it is not surprising that her work relationships were strained. Personality conflicts, though, are not adverse employment decisions nor do they constitute violations of the ADA. *See Adams v. Alderson*, 723 F.Supp. 1531 (D.D.C.1989) (personality conflict with an "antagonizing supervisor" did not constitute a disability under the ADA); *See also Palmer*, 905 F.Supp. at 507 (personality conflict with a supervisor that resulted in plaintiff's stress condition did not constitute a disability under the ADA).

nor that she was given a departmental memorandum containing a lower performance evaluation. *See* Mot. for Summ. J. at 16, 20. However, the defendant does contest the allegations that Ms. Weigert was denied secretarial support or that she was given less substantial work assignments. *See* Reply at 23, 24.

■■■■■ An employee claiming retaliation under the ADA also must show that she suffered a "materially adverse employment action." *McDonnell v. Cisneros*, 84 F.3d 256, 258 (7th Cir.1996). Adverse employment actions include "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). But "minor or trivial actions that make an employee unhappy are not sufficient to qualify as retaliation under the ADA." *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir.1999) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996)).

Because the ADA incorporates the procedures of Title VII, rulings in this area applying to adverse actions are relevant. This court has held that there must be a tangible change in duties or working conditions constituting a material employment disadvantage in order for an employment decision to rise to the level of adverse action. *See Jones v. Billington*, 12 F.Supp.2d 1, 14 (D.D.C.1997). As a corollary, courts are disinclined to recognize as adverse actions interlocutory or mediate decisions having no immediate effect on employment decisions or status. *See id.* This court has also held that mere inconveniences and alteration of job responsibilities will not rise to the level of adverse action as a matter of law. *See id.* Moreover, "[m]arginal distinctions with uncertain consequences are not adverse actions

for the purposes of Title VII." *Milburn v. West*, 854 F.Supp. 1, 14 (D.D.C.1994).

### a. Departmental Memorandum and Evaluation

■■■ Ms. Weigert contends that the defendant retaliated against her in 1993 by issuing a departmental memorandum that contained a low performance evaluation. *See* Opp'n at 56; Mot. for Summ. J., Ex. 22 (Departmental Memorandum from Bonnie L. Green to Susan Weigert, January 26, 1993) ("memorandum"). Formal criticism and poor performance evaluations do not ordinarily constitute "adverse actions." *See Brown v. Brody*, 199 F.3d 446, 458 (D.C.Cir.1999). However, if these evaluations and reports are *unjustified*, they may constitute adverse actions. *See Batson v. Powell*, 912 F.Supp. 565, 576 (D.D.C.1996).

Ms. Weigert alleges that Dr. Green explained that the memorandum was occasioned by the plaintiff's "poor judgment in filing a complaint against the department." However, Dr. Green testified that she did not "think [the memorandum] was specifically related to the complaint at all" and that it was occasioned by the ongoing problems that the team was having with the plaintiff. *See* Green Deposition at 166–67 ("Green Dep.") The defendant contends that Ms. Weigert's inappropriate behavior caused her to receive the annual evaluation, noting that her performance in the area of cooperation was less than satisfactory because of her racially and ethnically insensitive remarks and because she had not met the University's standard for affirmative action.[17] *See* Mot. for Summ. J. at 16. The plaintiff received the memorandum upon her return from administrative leave. In the first sentence, the memorandum advised Ms. Weigert that its purpose was "to clarify which behaviors

---

**17.** When the AAO determined that Ms. Weigert's complaint of disability discrimination was without merit, Ms. Weigert stated that the investigation and its findings, conducted by an African–American, were evidence of racism against white people. *See* Weigert Dep. at 459, 684.

are acceptable and unacceptable." Memorandum at 1.

The memorandum further states that the plaintiff was "clearly free to pursue any internal or external routes of grievance/complaint" if she felt she was being treated unfairly. *Id.* The memorandum referenced the "numerous threats to sue [Dr. Green] and others in the department" because, her supervisors stated, Ms. Weigert was continuously repeating her threats and that once a complaint was made, Ms. Weigert should not thereafter use these threats to produce an intimidating work environment. *Id.* at 1–2 (emphasis added).

The plaintiff states that none of the incidents in the warning notice *taken alone* would have been sufficient to warrant a written warning. *See id.* However, Ms. Mahin testified that "this discipline was issued for a *pattern* of behavior." Mahin Dep. at 236–37. Ms. Mahin continued, "when somebody is on notice that their behavior is inappropriate, when there are additional examples of inappropriate behavior, you can issue formal discipline." [18] *See id.* at 239.

Not only does the memorandum fail to support the plaintiff's contention that the defendant retaliated against her, it further documents misconduct on her part, including her allegations that Dr. Goldberg caused the death of her former therapist. *See id.* at 1. Viewing the facts in the light most favorable to the plaintiff, the court concludes that the memorandum and performance evaluation were justified responses necessitated by the plaintiff's behavioral problems and do not constitute adverse actions within the meaning of the ADA.

### b. Secretarial Support

■ The plaintiff also contends that the defendant denied her the secretarial support of MS. Gearhart. Dr. Green acknowledges that the plaintiff complained to her about this situation. *See* Green Dep. at 285. However, Dr. Green explains that Ms. Gearhart provided secretarial support to the whole division and Ms. Weigert often demanded immediate attention to her projects without regard to Ms. Gearhart's other duties. *See id.* at 283–87. Additionally, Dr. Green states that Ms. Weigert had a misunderstanding about Ms. Gearhart's work-related responsibilities. *See id.* at 286. From the record, it appears that Ms. Weigert's demand for immediate attention without regard to the needs of others was a consistent problem both in her work environment and in her clinical relationships.[19] The plaintiff also

---

18. The plaintiff also contends that the defendant "purportedly" has a progressive discipline policy that was not followed. *See* Opp'n at 43. However, the Georgetown University Business Polices and Procedures—Disciplinary Actions and Dismissals, submitted by the plaintiff, clearly sets forth that some violations of a policy, rule or regulation or "incident[s] of insubordination or misconduct will be of such gravity that any step in the disciplinary procedure, including immediate termination, will be justified," and that in those instances progressive discipline will not be necessary. *Id.*, Ex. 5 at 1. The policy also states that an employee's conduct may result in immediate termination even without prior discipline, stating that "gross misconduct," is an example of conduct justifying immediate termination. *Id.*, Ex. 5 at 7. The plaintiff was terminated for "gross misconduct." *See id.* at 43.

19. The plaintiff's doctors also observed her behavioral problems. Dr. Behlmer testified that the manner in which Ms Weigert interacted with the staff and her lack of sensitivity to other patients—especially her demands that Dr. Behlmer leave scheduled appointments immediately to confer with the unscheduled arrival of the plaintiff—were not conducive to the patient/doctor relationship. *See* Behlmer Dep. at 78–79. For example, Dr. Behlmer testified that Ms. Weigert used pressure tactics to force the doctor to refill her medications. *See id.* at 87–88. According to Dr. Behlmer, Ms. Weigert was "manipulative," demanded immediate attention and "request[ed] things associated with threats." *Id.* at 109. Eventually, Ms. Weigert's behavior caused a rupture in their relationship. *See id.* at 73. Dr. Dale, who treated the plaintiff after Dr. Behlmer, stated that "one day she might say to you your [sic] an angel, you're wonderful. I couldn't ask for a better

has failed to demonstrate that she was treated differently than the other employees in regard to secretarial support. However, even had she so established, this claim would be flawed because the plaintiff has failed to establish that such an action rises to the level of a "materially adverse action."

### c. Less Substantial Work Assignments

Ms. Weigert next alleges that upon her return from administrative leave, the defendant removed her from the cancer grant project and gave her less substantial work assignments. *See* Opp'n at 55. Dr. Green's testimony indicates that the decision to place Ms. Weigert on the cancer grant project had not been made before her administrative leave and Dr. Green "assured [the plaintiff] that *if it were decided that she would work on the grant*," her leave would not affect this. Green Dep. at 171. And although Dr. Green "hoped that [Ms. Weigert] would be able to work on it, ... given the problems with her interactions with other people in the office who were working on it, ... it wasn't clear that that would be able to happen." *See id.* at 172–73.

 While the D.C. Circuit has held that an "undesirable reassignment" might constitute an adverse action, a "transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action .... Mere idiosyncrasies of personal preference are not sufficient to state an injury." *Brown,* 199 F.3d at 458. Other than the conclusory statement that she was given only "busy" work upon her return, Ms. Weigert has not demonstrated that she was demoted, given less substantial work assignments or undesirably reassigned. She also has failed to detail the distinction in her assignments before and after her

doctor. Then the next day you are the worse [sic] doctor in the world, you're trying to kill me." Dale Dep. at 38–39. These reports suggest a consistent behavioral problem and

return. Given that after the plaintiff's return her interactions with other employees continued to deteriorate, culminating in threats against a co-worker, it would be unreasonable to infer that the defendant's failure to include Ms. Weigert on the cancer project was an adverse action.

### d. Termination

 The record establishes that the plaintiff was terminated from her job. *See* Mot. for Summ. J. at 20; Opp'n at 56. Because adverse employment actions include the "discharge of employees," and because this action would be material, the court determines that the plaintiff's termination constitutes an adverse action and, as such, she satisfies this element of a prima facie case of retaliation. *See* 42 U.S.C. § 12112(a).

### 2. Causal Connection Between Protected Activity and Adverse Action

 Having determined that Ms. Weigert's disability complaints constituted a protected activity and that her termination constituted an adverse action, the plaintiff must demonstrate that a causal connection existed between her complaints and her termination. The plaintiff may establish causation by showing that the employer knew about the plaintiff's participation in a protected activity and that the adverse action took place shortly thereafter. *See Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985). Ms. Weigert filed a formal complaint with the defendant's AAO in November 1992. *See* Mot. for Summ. J. at 14; Opp'n at 54. That office investigated the plaintiff's allegations by, among other things, interviewing witnesses. *See* Mot. for Summ. J. at 15. Dr. Green testified that she knew of Ms. Weigert's complaint to that office before the plaintiff was terminated. *See* Green Dep. at 134–37. Ms. Weigert also states that her co-workers

lend credence to the defendant's assertions that its actions did not relate to disability discrimination or retaliation.

said that they had all read her Affirmative Action report. *See* Opp'n at 23. Giving all reasonable inferences to the plaintiff, the court finds that Ms. Weigert's supervisors and co-workers knew she had filed a complaint with the AAO. The office concluded its investigation in January 1993 and the plaintiff was terminated less than four months later. *See* Mot. for Summ. J. at 15, 20. Given that her supervisors "knew of the [ ] investigation and that the adverse action followed so closely, it is clear that there [is] enough evidence to establish the causal connection for the purpose of establishing a prima facie case." *McKenna*, 729 F.2d at 791. The court concludes that Ms. Weigert has established a prima facie case of retaliation regarding her termination.

### 3. The Defendant's Legitimate Non–Retaliatory Reason

Although the departmental memorandum, low performance evaluation, alleged denial of secretarial support and less substantial work assignments do not constitute adverse actions, the plaintiff has established a prima facie case of retaliatory discrimination based on her termination. Since the plaintiff has established a prima facie case on this issue, the burden shifts to the defendant to show a legitimate non-retaliatory reason for its action.[20] *See id.* at 790.

Case law permits an employer to terminate an employee because of egregious misconduct, irrespective of whether the employee is disabled. *See Little v. FBI*, 1 F.3d 255, 259 (4th Cir.1993). For example, an employee may be terminated because of abusive, threatening or insubordinate behavior. *See Gordon v. Runyon*, 1994 WL 139411, at *4–5, (E.D.Pa. April 21, 1994) (postal employee's abusive and

threatening behavior justified termination and would otherwise unduly burden defendant by exposing other employees to a hostile and potentially threatening work environment); *Kahn v. United States Secretary of Labor*, 64 F.3d 271, 279 (7th Cir.1995) ("communication made in the form of threats of violence or insubordination ... toward supervisors and co-workers ... is justification for termination"). The law also recognizes poor performance as a legitimate nondiscriminatory justification for terminating an employee. *See Soileau v. Guilford of Maine, Inc.*, 928 F.Supp. 37, 53 (D.Me.1996). Additionally, an individual may be terminated "for any reason, or for no reason at all, as long as the decision to terminate [her] does not arise due to [her] protected status." *Id.* (citing *Mesnick v. General Electric Co.*, 950 F.2d 816, 823 (1st Cir.1991)).

The defendant argues that the plaintiff's gross misconduct led to her discipline and termination. In 1992, Dr. Green began to receive reports about problems with the plaintiff's interaction with other employees and her "rude and abrasive" interactions with colleagues. *See* Mot. for Summ. J. at 4, 16. Dr. Goldberg, chairman of the department, also received reports about the plaintiff's behavior. *See id.* at 5. Drs. Green and Goldberg consulted with Ms' Weigert's co-workers, and received five more reports of interaction problems with the plaintiff. *See id.;* Goldberg Deposition at 57 ("Goldberg Dep."); Green Dep. at 51, 71–75.

The defendant also contends that Ms. Weigert made racially and ethnically insensitive remarks to her co-workers, insulted other co-workers and created a threatening atmosphere. *See* Mot. for Summ. J. at 4–7. The defendant states

---

**20.** Had this court determined that the plaintiff had established a prima facie case of retaliation claims or disability discrimination under the ADA, its analysis would have continued under the exact same specifications as are described in this section and the following section. Therefore, even if the plaintiff

had established her prima facie case of discrimination, she still would not have survived summary judgment on that claim given the court's finding that the defendant established a legitimate, non-discriminatory reason for its actions, which the plaintiff has failed to prove was pretextual.

that it was required to discuss this behavior, both orally and in writing, with the plaintiff and to inform her that if she "did not change her behavior immediately, further disciplinary action could be expected." *Id.* at 7–8. In addition, the defendant discussed these disciplinary problems with the plaintiff before she filed her complaint with the AAO. *See* Green Dep. at 86–87; Mot. for Summ. J. at 14.

The defendant states that Ms. Weigert's interaction with her co-workers deteriorated after she filed her AAO complaint and after she was given a formal warning. *See* Mot. for Summ. J. at 17. Employees who worked outside the research team reported additional unsettling interactions with Ms. Weigert. *See id.* at 19. These episodes culminated in a statement from Ms. Weigert to a co-worker that she "could not control" her reaction, and caused at least one colleague to fear that she would physically harm an employee. *See id.* at 18, 19.

After learning of these conversations, Dr. Goldberg, Dr. Green and Ms. Mahin concluded that "even if plaintiff did not pose an actual threat to Ms. Gearhart or other Department employees, her venomous comments, as well as other similarly inappropriate actions, were sufficiently serious that the University had no choice but to terminate her employment." *Id.* at 19–20; Green Dep. at 304–07, 314, 320–21; Goldberg Dep. at 74, 283–87, 293, 296, 302, 318, 322, 324; Mahin Dep. at 56–58, 329–32, 340–49, 357, 365.

In *Palmer*, the district court granted summary judgment to the defendants because, among other reasons, the plaintiff did not establish that she was terminated because of her alleged disability rather than her misconduct in the workplace. *See* 905 F.Supp. at 510. The court found that the plaintiff's inability to control her behavior, even if the plaintiff "had no intention to do harm to anyone ... made plaintiff a 'direct threat to the health and safety' of the other workers.... Thus, the [defendant] was not required to employ plaintiff with the risk that others would be hurt by plaintiff's continued employment." *Id.* (citing the plaintiff's affidavit). The court found that the cause for her termination was not discrimination, but rather "plaintiff's own failure to recognize the acceptable limits of behavior in a clearly difficult situation for both the plaintiff and her co-workers." *Id.* Similarly, given the extensive documentation of Ms. Weigert's problematic behavior over a prolonged period, the court rules that the defendant has presented a legitimate nondiscriminatory reason for its termination of the plaintiff.

The court notes, too, that the record supports the finding that the defendant took favorable actions and attempted to accommodate the plaintiff after learning of her alleged disability. After Ms. Weigert informed her supervisor, Dr., Green, of her neurological condition, the defendant removed her from probationary status, converted her from part-time to full-time status, gave her a highly favorable annual performance evaluation in January 1992, and authorized a three-percent merit increase in her salary. *See* Mot. for Summ. J. at 4; Weigert Dep. at 117–18, 130, 193–94. The defendant argues it would not have taken those favorable actions *after* having learned of the plaintiff's alleged disability had it intended to discriminate or retaliate against her. *See* Mot. for Summ. J. at 4. To accommodate the plaintiff, the defendant allowed her to leave the office and work at home whenever she reported a headache. *See id.* at 31. The defendant reduced the fluorescent lighting as much as possible in places where the plaintiff worked. *See id.* The defendant drew window shades to eliminate natural light and moved furniture to further protect the plaintiff from glare. *See id.* Additionally, because a private office was not permanently available, the defendant ordered dividers for the plaintiff's office to shield her from a co-worker and eliminate additional light and glare. *See id.*

These attempts at accommodation, although initially not objected to by the plaintiff, eventually resulted in so much

friction that, in combination with the interaction problems described above, Ms. Weigert filed a complaint with the defendant's AAO and requested and received a paid leave. *See id.* at 13. Finally, upon her return, the plaintiff was given a private office, necessitating the removal of another employee from that office. *See id.* at 16. Although Ms. Weigert may have been dissatisfied with the variety of accommodations, "an employer is not required to accommodate an employee in any manner in which that employee desires." *Whillock v. Delta Air Lines, Inc.,* 926 F.Supp. 1555, 1565 (N.D.Ga.1995).

### 4. Was the Defendant's Proffered Explanation Pretextual?

Because the defendant has met its burden of producing a nondiscriminatory reason for its actions, the "presumption [of retaliatory discrimination] raised by the prima facie case is rebutted," and "drops from the case." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 255 and n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The plaintiff now has "the full and fair opportunity to demonstrate ... that the proffered reason was not the true reason for the employment decision" and that some other discriminatory motive was. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

The focus of the proceedings on summary judgment is "whether a jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." *Aka,* 156 F.3d at 1289. Proof that the defen-

dant's explanation is not credible is one form of circumstantial evidence of intentional discrimination, and can be quite persuasive. *See Hicks,* 509 U.S. at 517, 113 S.Ct. 2742. In appropriate circumstances, it is reasonable to infer from the falsity of the explanation that the employer is trying to conceal a discriminatory purpose. *See Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). However, proof that the "employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct." *Hicks,* 509 U.S. at 524, 113 S.Ct. 2742. There will also be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves* — U.S. —, 120 S.Ct. at 2109. The plaintiff's "attack on the employer's explanation must always be assessed in light of the total circumstances of the case." *Aka,* 156 F.3d at 1291.

The plaintiff, who has the ultimate burden of persuasion, may not offer her own speculations and allegations to refute an employer's legitimate, non-discriminatory reasons for its decisions. *See Brown,* 199 F.3d at 458; *Carpenter v. Federal Nat'l Mortgage Ass'n,* 165 F.3d 69, 72 (D.C.Cir. 1999). Evidence of pretext that is merely colorable or not significantly probative may not suffice to withstand summary judgment. *See Johnson v. Digital Equip. Corp.,* 836 F.Supp. 14, 18 (D.D.C.1993).

The plaintiff asserts that the timing of her discharge, and the increasingly serious adverse personnel actions in the preceding three months "add circumstantial evidence of a retaliatory animus." Opp'n at 56. Even assuming that this form of circumstantial evidence could give rise to an inference of retaliation, the defendant has documented lengthy, continuous and increasingly inappropriate behavior by the plaintiff during this time period. The plaintiff's testimony that she believes the

defendant's employees, Bonnie Green, Dr. Goldberg, Becky Chen, Shelly Silver and Pam Witcher, to be liars and that "most of the people in the department of psychiatry, in [her] opinion, are very unprofessional and do not tell the truth," does not cause the court to disbelieve these multiple testimonies. Weigert Dep. at 455–58. Based on the record, the court finds that a jury could not reasonably infer discrimination or retaliation from the combination of the plaintiff's prima facie case and "and inferences properly drawn therefrom … on the issue of whether the defendant's explanation is pretextual." *Reeves*, —— U.S. ——, 120 S.Ct. at 2106 (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089).

Employment discrimination claims involve an employer's intent and "writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers." *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994). Moreover, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* As such, the court has meticulously searched the record for evidence that could support the inference that the defendant's proffered reasons are pretextual. Yet the record strongly supports the position that action was taken against the plaintiff because of her own misconduct and not because of her engagement in a protected activity. The court determines that the plaintiff has not offered direct or circumstantial evidence to support the inference that the defendant's reason for its actions against her were pretextual.

### IV. CONCLUSION

For the reasons set forth above, the court will grant the defendant's motion for summary judgment on the plaintiff's claims of disability discrimination and retaliation. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 7th day of September, 2000.