Charles HAYNES, Plaintiff,

v.

Mayor Anthony WILLIAMS,
et. al., Defendants.

No. CIV.A.01–454.

United States District Court,
District of Columbia.

Aug. 26, 2003.

David A. Branch, Washington, DC, for Plaintiff.

Mary Pivec, Greenberg Traurig LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

This matter is before the Court on the Defendants' Motion for Summary Judgment ("Defs.' Mot."). The plaintiff initiated the claims in this action against the defendants pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701, *et seq.*, following the termination of his employment from the District of Columbia's Office of the Chief Financial Officer. The defendants assert, in part, that the plaintiff is unable to state a claim upon which relief can be granted under either the ADA or the Rehabilitation Act because he has not established a *prima facie* case of disability discrimination. Upon consideration of the parties' submissions and for the reasons set forth below, the Court will grant the defendants' summary judgment motion.

### I. *Factual Background*

The events giving rise to the filing of the plaintiff's complaint began in 1981 when the District of Columbia government hired the plaintiff to work in its Department of

Budget and Planning as a budget analyst. Defs.' Mot., Exhibit ("Ex.") C (Deposition of Charles Haynes, dated February 27, 2002) at 10–12. On April 26, 1996, authority over the plaintiff's position transferred from the Mayor of the District of Columbia to the Office of the Chief Financial Officer ("CFO"). Defendants LcvR 7.1(h) Statement of Material Facts In Support of Their Motion for Summary Judgment ("Defs.' Stat. of Facts") ¶ 1. Following this transfer, the plaintiff's "job duties were changed" and his new responsibilities required the plaintiff to have "substantial interaction with representatives from various city agencies[,] ... visit[ ] these agencies monthly to confer with managerial officials regarding expenditures and planning matters[,] ... [and] create[ ] financial spreadsheets and other presentations for persons within his office for use at meetings with various governmental agencies ... on a daily basis[.]" *Id.* ¶¶ 4–5. While the plaintiff and his co-workers were permitted to work flexible hours prior to this transfer of authority, the CFO at the time, Anthony Williams,[1] "terminated this liberal attendance policy and required all budget and accounting personnel to report for work from 8:15 a.m. to 4:45 p.m., except when the demands of the budget cycle required some employees to work beyond 4:45 p.m." *Id.* ¶ 7. During periods of heightened demands, "affected employees were permitted to report to work as late as 9:30 a.m." *Id.* At some point in 1992, the plaintiff developed a "medical condition, which seemed to be exacerbated by the work environment." Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"), Ex. A (Affidavit of Charles Haynes) ¶ 11. Plaintiff described his condition "as a sense of insects crawling on [his] skin causing severe irritation,

occurring shortly after [he] arrive[d] at work." *Id.* In May 1996, the plaintiff, along with several co-workers, filed a formal complaint with the District of Columbia's Office of Occupational Safety and Health claiming an environmental problem existed in the Office of Budget and Planning. *Id.*, Ex. D (Plaintiff's Memorandum to Gloria W. Boddie). In response, on June 28, 1996, the District of Columbia sprayed for "bugs and other flying insects." *Id.* Following the extermination effort, the plaintiff continued to experience these symptoms, *id.*, Ex. A ¶ 14, and between April and September 1997 he submitted three complaints about his continued discomfort which he alleged was caused by the environmental conditions in the office, *id.*, Ex. E (Memorandum to Gloria W. Boddie from Charles Haynes dated April 11, 1997).

In 1997, the plaintiff began seeing an allergist, Dr. James Mutcherson, regarding his condition. *Id.*, Ex. A ¶ 15. Dr. Mutcherson opined that the plaintiff's work environment exacerbated his condition, *id.*, Ex. B (Deposition of Dr. James A. Mutcherson dated February 21, 2002) at 21–22, and diagnosed the plaintiff to be a highly allergic individual, *id.*, Ex. N (Letter from Dr. Mutcherson to the defendants regarding Haynes' medical condition dated Jan. 21, 2000).

Around the same time plaintiff started receiving medical treatment, the defendants began to complain to the plaintiff about his work attendance and the time he was reporting to work. On September 17, 1997, the plaintiff received a memorandum from a supervisor "informing him that he needed to comply with the attendance policy and report to the Office by no later than

---

1. Anthony Williams is also one of the named defendants and is currently the Mayor of the District of Columbia.

9:30 a.m." Defs.' Stat. Of Facts ¶ 8 (citing Defs.' Mot., Ex. H (Memorandum from Bilal Salahuddin, Director of Data Management, to Haynes titled "Memo of Understanding")). In response to the defendants' concerns, the plaintiff acknowledged that his "work productivity [h]a[d] fallen or at least, that [he was] not performing up to the levels that [he] can," and that "[t]his is evident by the way [his] work hours have panned out over time—not necessarily due to late work hours but primarily to [his] inability to rest adequately and sleep reasonably well through each night". Pl.'s Opp'n, Ex. E (Memorandum to Gloria W. Boddie from Charles Haynes dated April 11, 1997). The plaintiff "informed" the defendants that he was attempting to "observe more 'normal' work hours" and attributed his employment problems to the environmental conditions at his workplace. *Id.* The plaintiff also explained that "[b]ecause [he] personally[ could not] show direct, in hand evidence of what [he] fe[lt was] bothering [him], it [was] hard for [him] to adequately explain or describe it." *Id.* On September 30, 1997, the plaintiff's supervisor sent another memorandum to the plaintiff acknowledging that he had shown "substantial improvement" in the time that he was arriving at work since the issuance of the September 17 memorandum, but that he had "been absent without leave between the hours of 9:30 a.m. (which is the latest time at which one may arrive) and 11:00 a.m. on several occasions .…" Defs.' Mot., Ex. I (Memorandum from Bilal Salahuddin to Haynes regarding "[a]bsence without leave and pay suspension" dated September 30, 1997). After receiving this second memorandum, the plaintiff apparently discussed with his Supervisor "the fact that he was working late because of his job assignments and he was

not sleeping. [The plaintiff also informed his supervisor at that time that] he believed it was unfair to expect him to work and complete assignments after hours and then come to work the next day by 9:30 a.m." Defs.' Stat. of Facts ¶ 9 (citing Defs.' Mot., Ex. C at 102–06).

On September 15, 1998, the plaintiff received a performance appraisal from the defendants stating that he "[n]eed[ed] to adjust his work schedule so that he can work during regular working hours and become a more effective team player." Pl.'s Opp'n at 4 (quoting Pl.'s Opp'n, Ex. A ¶ 18). In a further response he submitted on September 25, 1998, the plaintiff offered an in-depth explanation of his allergic condition, stating, in part, that he has

> continued to endure suffering and hardship, … experience health and wellness problems, suffer from a noticeable decline in concentration and productivity (both personal and occupational), endure deep frustration and stress, and suffer from chronic fatigue resulting from having to endure this … ordeal coupled with an inability to rest adequately during normal sleeping hours at home.

Defs.' Mot., Ex. G (Comment on Employee Performance Evaluation from Charles Haynes) at 2. The plaintiff also complained that the District of Columbia failed to test the air quality of his working environment, which he suggested had apparently been promised to him. *Id.* The plaintiff indicated that he not only had to see an allergist at his own expense but that he also had to submit a dust sample for analysis to an independent laboratory which revealed a "high exposure level for environmental mold, and a low exposure level for dust mite allergen."[2] *Id.* In his deposition, the

---

**2.** The Court notes that although the plaintiff states that he "located a research laboratory in Kansas which offered a 'Mite and Mold

Check' test kit … which indicated that there was a high exposure for environmental molds and a low exposure level for dust mite aller-

plaintiff further explained his sleeping problems, stating that on some nights he obtained no sleep while on other nights he received four hours of sleep. *Id.*, Ex. C at 74. According to the plaintiff, "[i]n 1998 and on several prior occasions, [he] requested accommodations for [his] medical condition, including testing the work area for mold(s) and mites and other airborne organisms and to eliminate the problem, and a flexible work schedule which would allow [him] to come to work at later times when [he] suffered sleep deprivation." Pl.'s Opp'n, Ex. A ¶ 24.

On January 25, 1999, the plaintiff met with his supervisor and another department manager to discuss complaints about his work performance, and the plaintiff was told that "his failure to work during the regular business hours was preventing him from being fully productive and was becoming an inconvenience to his co-workers." Defs.' Stat. of Facts ¶ 12. (citing Defs.' Mot., Ex. C at 121–22). The plaintiff explained that "his work hours were dictated by the nature of his work (receiving assignments late in the day) as well as his skin condition . . . ." *Id.* (citing Defs.' Mot., Ex. C at 125–26). In response to the plaintiff's complaints, the defendants hired specialists to test the air quality, which resulted in a finding that there were no significant air quality problems. *Id.* (citing Defs.' Mot., Ex. C at 128–30, Ex. K (Haynes' Employee Performance Evaluation)). On May 5, 1999, after receiving the results of the air quality test, the plaintiff's supervisor informed the plaintiff "that [the Office of the Chief Financial Officer] would no longer tolerate [the plaintiff's] excuses for failing to report within normal duty

hours[,]" Defs.' Stat. of Facts at ¶¶ 12–13 (citing Defs.' Mot., Ex. C at 131–32), and that starting on May 10, 1999, the plaintiff was required to work his assigned tour of duty from 9:30 a.m. to 6:00 p.m., Defs.' Mot., Ex. J (Memorandum from John Nitz, Director of Data Management, to Haynes dated May 5, 1999). And in this May 5 Memorandum, the plaintiff's supervisor specifically asked the plaintiff to submit any test results, including doctors visits, with respect to the environmental problem the plaintiff was complaining about. *Id.* The plaintiff acknowledged in his deposition that "prior to [his] termination . . . [he] never provided any physician reports or medical documentation from the[ ] physicians that [he] visited to any of [his] supervisors, human resources, or anyone else in management[.]" Defs.' Mot., Ex. C at 79. However, the plaintiff states in an affidavit submitted to the Court that in the "correspondence concerning [his] medical condition, [he] identified six medical doctors who had treated [him] for [his] medical condition . . . [and that he] informed [his] supervisors that [he] had seen an allergist and was informed that [he] was highly allergic to organic and inorganic allergens." Pl.'s Opp'n, Ex. A ¶ 23. The plaintiff further states that he "offered to provide a report from [his] allergists, describing [his] medical condition [,but his] supervisors declined this offer to obtain a report from [his] allergist." [3] *Id.*

On September 30, 1999, the plaintiff received another performance evaluation that once again reflected that "he ha[d] still failed to maintain a work schedule that meets his assigned tour of duty."

gen . . . [and that these] test results were submitted to [his] supervisors[,]'' he has failed to submit a copy of these test results.

**3.** On January 21, 2000, following his termination, the plaintiff had Dr. Mutcherson submit a medical report to the Office of the Chief

Financial Officer. Defs.' Stat. of Facts ¶ 17. The defendants state that this was the first time they received any medical documentation suggesting that the plaintiff had a medical condition. *Id.*

Defs.' Mot., Ex. K (Haynes' Employee Performance Evaluation). During his deposition, the plaintiff acknowledged that in 1999 he typically reported to work between the hours of 1:00 p.m. and 1:30 p.m., and sometimes as late as 5:00 p.m. Defs.' Stat. of Facts ¶ 15 (citing Defs.' Mot., Ex. C at 147–49). In his affidavit, the plaintiff stated that he responded to his last performance evaluation by again indicating that his "work schedule was a direct result of the airborne parasites which made [him] ill, and ultimately resulted in sleep deprivation." Pl.'s Opp'n, Ex A ¶ 28.

On January 14, 2000, the plaintiff's employment was terminated "for his refusal to work within his tour of duty, his inability to provide accurate work product and his failure to participate in important meetings during the regular working hours." Defs.' Stat. of Facts ¶ 16 (citing Defs'. Mot., Ex. D (Deposition of John E. Nitz)) at 13; Ex. E (Deposition of Gordon McDonald at 13–14).

## II. *Standard of Review*

Summary Judgment is generally appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To prevail under Rule 56, the moving party must show that the non-moving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is generally understood that when considering a motion for summary judgment a court must "draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true." *Greene v. Amritsar Auto Servs. Co.,* 206 F.Supp.2d 4, 7 (D.D.C.2002) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). The non-moving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [his] position." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The District of Columbia Circuit has stated that the non-moving party may not rely solely on mere conclusory allegations. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999). Thus, "[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Application of the standard of review is necessarily impacted by the record that is before the Court. The defendants assert that because the plaintiff failed to comply with this Court's local rule, which requires the submission of a separate concise statement of genuine issues setting forth all material facts that are in dispute along with an opposition to a summary judgment motion, the defendants' statement of facts should be considered admitted by the plaintiff. Defendants' Reply to Plaintiff's Opposition to Summary Judgment ("Defs.' Reply") at 3–4.[4] Local Rule 56.1 of this Court specifically governs summary judgment motions and provides, in relevant part:

An opposition to [summary judgment] *shall* be accompanied by a separate con-

---

**4.** While the defendants primarily cite Local Rule 7.1(h), the Court finds it appropriate to analyze the defendants' proposition under Local Rule 56.1, which specifically deals with summary judgment motions.

cise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which *shall* include references to the parts of the record relied upon to support the statement ... In determining a motion for summary judgment, the court *may* assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion. *Id.* (emphasis added). Local Rule 56.1 "isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Burke v. Gould,* 286 F.3d 513, 517–19 (D.C.Cir.2002) (citing *Gardels v. C.I.A.,* 637 F.2d 770, 773 (D.C.Cir.1980)); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 151 (D.C.Cir.1996). This rule was meant to prevent district courts from having to "sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [an] analysis and determination of what may, or may not, be a genuine issue of material disputed fact." *Burke,* 286 F.3d at 518 (citing *Twist v. Meese,* 854 F.2d 1421, 1425 (D.C.Cir.1988)). Instead, the rule "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson,* 101 F.3d at 151 (citing *Twist,* 854 F.2d at 1425). However, the District of Columbia Circuit has cautioned that "in view of the severity of dismissal of a potentially meri-

torious claim ... [,] treating an issue as conceded for failure to respond fully to a motion for summary judgment 'should only be applied to egregious conduct.'" *Burke,* 286 F.3d at 518–19 (quoting *Robbins v. Reagan,* 780 F.2d 37, 52 n. 23 (C.A.D.C. 1985) (citations omitted)).

In this case, the plaintiff clearly failed to comply with Local Rule 56.1 because his statement of genuine issues setting forth all material facts that are in dispute simply recites conclusions of law regarding the elements necessary to prove a claim under the ADA. However, compliance with Local Rule 56.1 lies with the discretion of the court. *See, e.g., Burke,* 286 F.3d at 517–19; *Cleveland County Assoc. for Gov't by the People v. Cleveland County Bd. of Comm'rs,* 142 F.3d 468 (D.C.Cir.1998). Nothing in the language of Local Rule 56.1 requires this Court to consider all the material facts in the defendants' Statement of Material Facts admitted because the plaintiff failed to comply with Local Rule 56.1.[5] Additionally, the local rules supplement and should be construed in harmony with the Federal Rules of Civil Procedure. *See Frazier v. Heebe,* 482 U.S. 641, 107 S.Ct. 2607, 96 L.Ed.2d 557 (1987); *Miner v. Atlass,* 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462 (1960); Local Rule 1.1(a). Federal Rule of Civil Procedure 56(c) requires the court to consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, in determining whether there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Here, the

---

5. In *Burke,* the Court pointed out that "[t]he plain language of Local Rule 56.1 does not require the district court to enter judgment because of the nonmoving party's default in complying with the local rule. It provides that the district court *may* assume the facts

identified by the moving party in its statement of material facts are admitted in the absence of a statement of genuine issues filed in opposition to the motion for summary judgment." 286 F.3d at 518 (quoting from Local Rule 56.1) (emphasis added).

Court is not overburdened by the task of reviewing all of the parties' submissions because the record is not extensive. Therefore, although the plaintiff has failed to submit a statement of material facts that are in dispute which complies with Local Rule 56.1, the Court will consider all the evidence in the record in determining whether any genuine issues of material fact exist.

## III. *Legal Analysis*

"The ADA requires covered entities ... to provide 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship.'"[6] *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)). And the ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* (quoting 42 U.S.C. § 12111(8)). Finally, the ADA provides that:

> The term 'disability' means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

*Id.* (quoting 42 U.S.C. § 12102(2)).

### (A) *Does the Plaintiff Have a Disability Within the Scope of the ADA and the Rehabilitation Act?*

■■■ As the Supreme Court emphasized in *Toyota*, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Id.* at 195, 122 S.Ct. 681. The Court will therefore begin its analysis of the plaintiff's ADA and Rehabilitation Act claims by examining whether the plaintiff has a disability within the scope of these statutes and, for purposes of this case, will determine whether he has "a physical or mental impairment that substantially limits one or more [of his] major life activities" or whether he was "regarded as having such an impairment" by the defendants.[7] 42 U.S.C. § 12102(2).

### (1) *Does the Plaintiff Have a Disability that Substantially Limits a Major Life Activity?*

■■■ The defendants do not take issue with the plaintiff's assertion that he has a physical impairment,[8] *i.e.*, idiopathic pruritus, Pl.'s Opp'n, Ex. B at 31, but rather whether this disability falls within the scope of the ADA, *see* Defs.' Reply at 4. Here, the plaintiff asserts that his "medical condition certainly limited a major life activity—sleep."[9] Pl.'s Opp'n at 13. The

---

6. The Court notes that the Rehabilitation Act provides that the ADA's standards are to be utilized in determining whether the Rehabilitation Act has been violated. *See* 29 U.S.C. § 794(d). In this Opinion the Court will utilize the definitions and standards applicable to the ADA in determining whether the plaintiff has proven that either statute was violated.

7. The plaintiff does not assert that he falls within the ADA's definition of being disabled

because there is a record of such impairment. Accordingly, the Court does not need to address whether this definition has been satisfied.

8. A "physical impairment" is a "condition ... affecting one or more ... body systems ...." 29 C.F.R. § 1630.2(h).

9. The Court notes that the plaintiff has not asserted that his disability substantially limits his ability to perform the major life activity of

*Toyota* Court stated that a " 'major life activit[y] . . . refers to those activities that are of central importance to daily life.' " 534 U.S. at 197, 122 S.Ct. 681. While the District of Columbia Circuit has not addressed whether sleep is a major life activity under the ADA, *see Scarborough v. Natsios,* 190 F.Supp.2d 5, 21 n. 14 (D.D.C. 2002), several other Circuits have concluded that it is, *see, e.g., Boerst v. Gen. Mills Operations, Inc.,* 25 Fed.Appx. 403, 406–07 (6th Cir.2002); *Doyal v. Oklahoma Heart, Inc.,* 213 F.3d 492, 496 (10th Cir.2000); *McAlindin v. County of San Diego,* 192 F.3d 1226, 1234 (9th Cir.1999); *Colwell v. Suffolk County Police Dep't.,* 158 F.3d 635, 643 (2d Cir.1998). This Court sees no reason to reach a different conclusion.

The Court must now examine whether the limitation on the plaintiff's ability to sleep is substantial. In *Toyota,* because the Department of Health, Education, and Welfare's Rehabilitation Act regulations did not define the term "substantially limits," the Supreme Court looked to the EEOC's ADA regulations on the subject for guidance.[10] 534 U.S. at 195–96, 122 S.Ct. 681. Consistent with the EEOC regulations, the Supreme Court held that " 'substantially limit[s]' . . . [means that] 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.' " *Id.* at 198, 122 S.Ct. 681. The *Toyota* Court further held that "the impairment's impact must also be permanent or long term." *Id.* (citing 29 C.F.R. § 1630.2(j)). Moreover, recognizing that

the ADA's definitions "need to be interpreted strictly to create a demanding standard for qualifying as disabled[,]" *id.* at 197, 122 S.Ct. 681, the *Toyota* Court held that also

> [i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial. That the Act defines disability with respect to an individual, makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner[,]

*id.* at 198, 122 S.Ct. 681 (citations and quotation marks omitted). While the *Toyota* Court only dealt with the proof necessary to establish a substantial limitation in the major life activity of performing manual tasks, this Court sees no reason why such an analysis would not be equally applicable to the plaintiff's claims involving the major life activity of sleep. *See Stein v. Ashcroft,* 284 F.3d 721, 726–27 (7th Cir. 2002) (applying *Toyota* analysis to the court's consideration of whether plaintiff's impairment substantially limited major life activities of "loss of sleep, impaired sexual relations, inability to participate in sports, inability to cut her food and inability to brush her hair."); *cf. Philip v. Ford Motor Co.,* 328 F.3d 1020, 1025 (8th Cir.2003) (recognizing that Toyota "dealt only with

working. However, even if the plaintiff made this assertion, his claim would still fail because his disability does not preclude him from working in a broad class of jobs. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491–92, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

**10.** The Supreme Court "accept[ed that] the EEOC regulations are reasonable" in light of the parties acquiescence to their reasonableness. *Id.* at 194, 122 S.Ct. 681. Here, the defendant relies on the EEOC regulations and the plaintiff does not take exception to their reasonableness.

the proof necessary to establish a substantial limitation in the major life activity of performing manual tasks. Nevertheless, [the court found] its premise equally applicable to [the plaintiff's] claims involving the major life activities of gripping, reaching, lifting, standing, sitting and walking.").

In this case, the plaintiff has failed to submit sufficient evidence to demonstrate that the extent of his sleeping limitation is substantial within the meaning of the ADA and the Rehabilitation Act. The plaintiff has presented an affidavit and several memoranda submitted to his employer, which are attached to his opposition to the defendants' summary judgment motion, and indicate that he had a problem falling asleep at night. For example, in his affidavit, the plaintiff states that when he "arrived at home, [he] was unable to sleep and often would not fall asleep until 4:00 a.m. or later, or not at all." Pl.'s Opp'n, Ex. A ¶ 16. And, in memoranda submitted to his supervisors, he stated that "[m]y struggle has become an around the clock vigil of what I can call battle fatigue and survival. This is evident by the way my work hours [have been affected by] my inability to rest adequately and sleep reasonably well through each night." Pl.'s Opp'n, Ex. E (May 19, 1997 memorandum at 2). He further asserts that "[i]t has become usual for me to be able to sleep by 4:00 A.M. although there are periods of time when I can sleep by 1:00–A.M. or as late [as] 6:00+ A.M. [,]" Pl.'s Opp'n, Ex. G (September 15, 1998 Addendum to Employee Performance Evaluation at 5). In *Stein v. Ashcroft,* 284 F.3d 721 (7th Cir. 2002), the only support the plaintiff offered for his assertion that his impairment caused a loss of sleep was an affidavit filed with the district court. In affirming the district court's grant of summary judg-

ment, the Seventh Circuit stated that the plaintiff "has failed to present any medical records, evaluations or opinions that support . . . the . . . existence of these alleged specific limitations on her ability to function, i.e., lost sleep . . . ." *Id.* at 726. The Seventh Circuit noted that "[b]ald and self-serving assertions in affidavits, unsubstantiated by any documentation or other testimony, are not sufficient to create a material issue of fact as to whether an impairment has substantially limited a major life activity." *Id.* (citation omitted). Citing *Toyota,* the *Stein* Court noted that a plaintiff "must present evidence that the impact of the limitation is 'permanent or long-term,' and that 'the extent of the limitation . . . in terms of [the plaintiff's] own experience . . . is substantial.'" *Stein,* 284 F.3d at 726 (quoting *Toyota,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615). Here, the plaintiff has clearly failed to meet this burden. Although he attaches a copy of Dr. Mutcherson's deposition and a January 21, 2000 letter from Dr. Mutcherson to his employer, neither document contains any evidence regarding the extent to which the plaintiff's physical impairment impacted his ability to sleep. Further, the documents fail to explain the extent to which the amount of sleep the plaintiff was obtaining impaired his ability to perform his job as required by the defendants. In fact, it appears that the plaintiff asked Dr. Mutcherson to "draft an opinion for him that he could not report to work before 3:00 o'clock in the afternoon[,]" which Dr. Mutcherson refused to do. Pl.'s Opp'n, Ex. B at 30–31. And, during Dr. Mutcherson's deposition, the defendants' counsel specifically asked him if the plaintiff was "incapable of reporting to work on a regular schedule of 9:00 to 5:00[,]" which he failed to specifically answer.[11] Dr. Mutch-

---

11.   In response to defendants' counsel's question, Dr. Mutcherson stated "I think he was

erson's deposition simply states that the plaintiff's "sleeping problem was that he was having difficulty sleeping because he was continually itching and scratching, so that would keep him up at night." [12] *Id.* at 19. And Dr. Mutcherson's letter does not even mention the plaintiff's sleep problems. Pl.'s Opp'n, Ex. N.

Furthermore, the Court notes that even the plaintiff's self-serving evidence fails to establish that his sleep problem was severe. As stated above, the plaintiff submitted evidence that he would fall asleep on average at 4:00 a.m., although on some nights it might be as early as 1:00 a.m. or as late as 6:00 a.m. Pl.'s Opp'n, Ex. A ¶ 16; Ex. G; Def.'s Mot., Ex. 73–74. This clearly does not satisfy the degree of severity required under the ADA. *See, e.g., Boerst,* 25 Fed.Appx. at 407 ("[g]etting between two and four hours of sleep a night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA."). It is also significant that the plaintiff has offered no evidence that his sleeping limitations were of a long-term or permanent nature. *See Pack v. Kmart Corp.,* 166 F.3d 1300, 1306 (10th Cir.1999) (finding that the plaintiff had failed to submit any evidence of a long-term or permanent limitation on his ability to sleep because the only limitation was for a specific period of time during 1994 and January 1995). On this point, the Court finds it noteworthy that at the time of Dr. Mutcherson's depo-

sition in February 2002, he testified that the plaintiff had not visited him since January 2000. Pl.'s Opp'n, Ex. B at 27–28. In fact, it appears that the plaintiff had only seen Dr. Mutcherson a total of seven times (*i.e.,* five times in 1997, one time in 1999, and one time in 2000). *Id.* And, the plaintiff's claim that his allergies were aggravated by the environment at the Office of Budget and Planning,[13] without evidence that other environmental sources also exacerbated the problem, Pl.'s Opp'n, Ex. E, logically leads this Court to the conclusion that since the plaintiff is no longer working in that office his sleeping problem has either abated to some degree or has been alleviated totally. This conclusion causes the Court to find that the plaintiff has failed to present proof that the extent of his disability is long-term or permanent.

For all of the above reasons, the Court concludes that the plaintiff has failed to demonstrate that his impairment substantially limits his ability to sleep. The Court must now consider whether the plaintiff has satisfied any other disability definition of the ADA or the Rehabilitation Act.

### (2) *Did the Defendants "Regard" the Plaintiff As Disabled?*

The "regarded as" prong of a disability claim requires an employee to demonstrate that an employer regarded the employee as having an impairment that substantially limits a major life activity. 42 U.S.C. § 12102(2)(C); *Bragdon v. Abbott,* 524 U.S. 624, 658, 118 S.Ct. 2196,

---

particularly troubled because not being able to sleep, I think this created a lot of anxiety problems. A lot of things snowballed around the fact that he simply was not sleeping properly. Then when he got to work, he had some of the same complaints at work. He would go to work and he was itching at work also. There was no place, no haven for him to get relief, particularly." Pl.'s Opp'n, Ex. B at 21.

**12.** It is noteworthy that Dr. Mutcherson admitted, however, that he never referred the plaintiff for "sleep testing to see if there was some problem in his ability to sleep[.]" *Id.* at 31.

**13.** Dr. Mutcherson actually testified that "clearly most of [the plaintiff's] problems— occurred at work. I was fairly convinced of that." Pl.'s Opp'n, Ex. B at 23.

141 L.Ed.2d 540 (1998). An employer must not only erroneously believe that an employee suffers from an impairment, but must consider the employee substantially limited in a major life activity. *Weigert v. Georgetown Univ.*, 120 F.Supp.2d 1, 13 (D.D.C.2000). And, "[a]n employer's attempts to accommodate an employee's concerns and perceived needs does not establish that the employer regarded the employee as having a disability." *Id.* (citation omitted).

In this case, there is no evidence that the defendants erroneously believed that the plaintiff suffered from an impairment that substantially limited a major life activity. Instead, the evidence shows that the defendants consistently expected the plaintiff to 'perform the essential functions of his job and arrive at work during regular working hours. In written correspondence dated September 17, 1997 (Defs.' Stat. Of Facts ¶ 8), September 30, 1997 (Defs.' Mot., Ex. I), and September 15, 1998 (Pl.'s Opp'n at 4), the defendants informed the plaintiff that he must report to work during regular business hours. In fact, on January 25, 1999, the defendants told the plaintiff that "his failure to work during regular business hours was preventing him from being fully productive and was becoming an inconvenience to his co-workers." Defs.' Stat. of Facts ¶ 12 (citing Defs.' Mot., Ex. C at 121–122). In response to the plaintiff's claims that environmental problems in the office were effecting his ability to acquire sufficient sleep, the defendants hired specialists to test the air quality, which resulted in a finding that there were no significant air quality problems.[14] *Id.* (citing Defs.' Mot., Ex. C at 128–130, Ex. K). On May 5, 1999, after receiving the results of the air quality test, the plaintiff's supervisor in-

formed him "that he would no longer tolerate his excuses for failing to report within normal duty hours[,]" *id.* ¶ 13 (citing Defs.' Mot., Ex. C at 131–132), and that starting on May 10, 1999, the plaintiff was required to work his assigned tour of duty from 9:30 a.m. to 6:00 p.m., Defs.' Mot., Ex. J. From this evidence, the Court concludes that the record clearly demonstrates that at no time did the defendants perceive that the plaintiff had an impairment that substantially limited his ability to sleep or otherwise perform his job.

Finally, the Court notes that "[t]he legislative history of the ADA indicates that Congress intended the "regarded as" definition to protect people from a range of discriminatory conduct based on myths, fears and stereotypes about disability that can occur even when a person does not have a substantially limiting impairment." *Weigert*, 120 F.Supp.2d at 12 (citing 29 C.F.R. § 1630.2(*l*)); *see also* 1 EEOC Technical Assistance Manual § 2.2(a), *reprinted in* ADA Manual (BNA) § 90:0512 (1992). The plaintiff offers no evidence to show that the defendants regarded the plaintiff as a person with a disability based on such myths, fears, or stereotypes.

### IV. *Conclusion*

For all of the reasons set forth above, the Court concludes that the plaintiff has failed, as a matter of law, to establish a claim under either the ADA or the Rehabilitation Act. Thus, the Court must grant the Defendants' Motion for Summary Judgment.[15]

---

**14.** *See* footnote 2, *supra.*

**15.** An Order consistent with the Court's ruling accompanies this Memorandum Opinion.